**Exhibit N**

| | |
|---|---|
| **DENVER DISTRICT COURT**<br>1437 Bannock Street<br>Denver, CO 80202 | DATE FILED: June 21, 2023 10:58 PM<br>FILING ID: ▲ COURT USE ONLY ▲<br>CASE NUMBER: 2023CV30248 |
| **Plaintiff: RONALD JENSEN**;<br><br>v.<br><br>**Defendants: CITY AND COUNTY OF DENVER,** a municipal corporation; and **CODY LANE**, in his individual capacity. | |
| **Attorney for Plaintiff**<br>Edward Milo Schwab, #47897<br>Ascend Counsel, LLC<br>2401 South Downing Street<br>Denver, CO 80210<br>(303) 888-4407<br>milo@ascendcounsel.co | Case No.   2023 CV 030248<br>Division:        203 |
| **FIRST AMENDED COMPLAINT AND JURY DEMAND** | |

Plaintiff Ronald Jensen, by and through their attorney, E. Milo Schwab of Ascend Counsel, LLC, respectfully alleges for their First Amended Complaint and Jury Demand as follows:

## JURISDICTION AND VENUE

1.  This Court has jurisdiction over the subject matter of this action pursuant to C.R.S. Const. art. VI,§ 9(1), and over the parties pursuant to C.R.S. § 13-1-124(1)(b) because this action arises from the commission of tortious acts within the State of Colorado, by residents of the State of Colorado.

2.  Pursuant to C.R.C.P. 98(c), venue is proper in the District Court in and for the City and County of Denver because the conduct complained of occurred within the City and County of Denver.

## PARTIES

3.   Plaintiff Ronald Jensen is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

4.   Defendant City and County of Denver is a municipal corporation in the State of Colorado. The Denver Police Department (DPD) is a subdivision of the City and County of Denver.

5.   At all times pertinent to the subject matter of this litigation, Defendant Cody Lane was a police officer employed by the Denver Police Department and was a citizen of the United States and a resident of the state of Colorado. All claims are brought against Defendant Lane in his individual capacity.

## FACTUAL ALLEGATIONS

6.   On the evening of June 24, 2022, Plaintiff Ronald Jensen was out in public filming in the streets of Denver.

7.   At just after midnight, an off duty police officer, employed by ViewHouse bar on 20th and Market Street, demanded that Mr. Jensen stop filming and threatened him with arrest for trespassing.

8.   Mr. Jensen, knowing that Colorado law and the Constitutions of both the state of Colorado and the United States protect the right to film on public sidewalks, refused this unlawful order.

9.   Several minutes later, more Denver police officers arrived to confront Mr. Jensen.

10.   One of the officers that responded was Defendant Cody Lane.

11.   At some point, Plaintiff came to be interacting with and filming Defendant Lane.

12.   During this entire interaction, Plaintiff never threatened Defendant, engaged in any unlawful conduct, nor resisted arrest.



13.     While standing several feet away from Defendant Lane, Plaintiff continued to film.

14.     Defendant Lane expressed anger at this interaction and lost his temper.

15.     Defendant Lane next pushed Mr. Jensen to the ground.



16.     Mr. Jensen, a 62 year old veteran, fell to the ground as a result of Defendant's conduct.



17.     When Defendant Lane decided to use force on Mr. Jensen, Mr. Jensen was committing no crime, was a danger to no individual, was creating no risk of property damage, and was not resisting arrest.

18.     Mr. Jensen was simply filming police officers.

19.     Defendant Cody Lane, with a past history of using excessive force, simply lost his temper and punished Mr. Jensen for filming him.

20.     Defendant Lane's history with the Denver Police Department was brief, but his history of excessive force complaints is exceptionally long.

21.     Within his first two years as a Denver Police Officer on February 15, 2020 Defendant Lane responded to a domestic dispute. During this interaction, Defendant Lane punched one of the individuals multiple times in the face and used his taser on the

back of the man's back while the man was handcuffed. As the Denver Police Department Internal Affairs Bureau would later conclude, "[t]here was no threat or overt act of an imminent assault which would have justified the use of physical strikes…The force used by Officer Lane (in striking RC multiple times with a closed fist in the face) was neither reasonable or necessary under the totality of the circumstances present."

22. Defendant Lane was suspended for thirty (30) days as a result of his conduct on February 15, 2020. Such discipline was to run from September 6, 2020 through October 5, 2020.

23. However, while internal affairs was conducting this first investigation, Defendant Lane had engaged in conduct which would later result in a second complaint of excessive force. Citizen complaint P2022-0241 was filed on October 26, 2022, however it related to an incident from April 9, 2020.

24. Several months after Mr. Lane finished his suspension for punching a man in the face, he again engaged in conduct which resulted in an excessive force complaint. On March 16, 2021, a citizen filed a complaint for excessive force relating to an incident from January 13, 2021. This matter was assigned case number P2021-0036 by the Internal Affairs Bureau.

25. Yet again, on July 2, 2021, Defendant Lane engaged in excessive force which resulted in an excessive force complaint, which was assigned the IAB number P2021-0105.

26. In total, this represents five separate instances of excessive force over a period of thirty (30) months.

27. Defendant Denver was aware that Defendant Lane was unfit to be a police officer, that he misread situations, and that he was quick to use violence when situations did not call for it.

28. Nonetheless, Defendant Denver refused to discipline him for the three incidents which followed where he exhibited violence tendencies.

29. More troubling, Defendant Denver was put on notice repeatedly that Defendant Lane should not be a Police Officer, yet it permitted him to continue to carry a badge and a gun on the streets of Denver.

30. Knowing that Defendant Lane was volatile and likely to continue to use unreasonable force, Defendant Denver continued to put Defendant Lane in uniform.

31. If Defendant Denver had taken appropriate action, Defendant Lane would not have been a police officer and Ron Jensen would not have been subjected to Defendant Lane's violence.

32. Though the Defendants' egregious actions in this case are a singular incident, their actions are in lock step with numerous other incidents of excessive force used by Denver Police Department Officers on those that are not resisting, not creating a danger to others, and who are in custody or under restraint. The ambiguity and insufficiency of the policy has led to the following incidences of excessive force:

    a. In 2010 Irene Rodriguez was assaulted by law enforcement receiving contusions, abrasions, bruises, and left elbow fracture. The City of Denver settled the matter in 2015 for $140,000.

    b. Denver City Attorney David Fine reported to the Denver City Council in September of 2010 that the City of Denver has spent nearly $6.2 million since

2004 to settle lawsuits involving police officers, and nearly all of the payouts were for allegations of excessive force. Council members had asked Fine to research litigation patterns after controversy erupted the previous month over a video that showed an officer beating a 23-year old man who was talking on a cell phone.[1]

c.      Since 2004, the average settlement in Denver for an excessive-force claim against the police has been about $97,000. The City paid nearly $3 million to settle three lawsuits, pushing the average up. In all, the city paid out $5 million in settlements for excessive force since 2004.[2]

d.      Between January and June of 2010, 17 Denver police officers were associated with excessive force complaints, a higher ratio per law enforcement officer than any other U.S. City.[3]

e.      In 2008, the City of Denver and Denver Health paid a combined $7 million to the family of Emily Rae Rice, who had died while in custody of the Denver Sheriff's Department. Ms. Rice had alleged that the City's treatment of her after she was detained violated her constitutional rights leading directly to her death. It was alleged that the City had destroyed or otherwise tampered with video and other evidence, and had engaged in a cover-up of the wrongdoing. After initially denying any liability on any of the claims, the Defendants paid $7 million and agreed to many policy changes.

---

[1] Christopher N. Osher, Denver Has Spent Nearly $6.2 Million Since 2004 to Settle Suits Against Police, The Denver Post, Sept. 15, 2010, available at http://www.denverpost.com/news/ci_16076344.
[2] Id.
[3] Joel Warner, Police Misconduct: Denver Ranks Number One in Terms of Excessive Force Complaints, The Westword, Sept. 10, 2010, available at
http://blogs.westword.com/latestword/2010/09/police_misconduct_denver_ranks_number_one_in_terms_ of_excessive_force_complaints.php.

f.     In 2008, the City of Denver paid $150,000 to Timothy Thomason, who was deprived of medical care while in the city jail.[4]

g.     In 2004, the City of Denver paid the family of Paul Childs $1.32 million to settle a lawsuit brought after Paul Childs, a developmentally disabled 15 year-old boy, was fatally shot by Denver Police Officer James Turney.[5]

h.      In 2004, the City of Denver paid Terrill Johnson $75,000 to settle a lawsuit against the City, Denver Police Chief Gerald Whitman, and Denver Police Officers Troy Ortega, Louis A. Estrada, Perry Speelman, Richard Eberharter, Randy Yoder, and Danny Perez for excessive force.

i.     Jeffrey R. Mayton settled with the City and County of Denver and Denver Police Officers Josh E. Valerio, Gerard Alarcon, and Robert J. Wycoff. Mr. Mayton for excessive force in 2005.

j.     Quincy Michael Shannon settled with the City and County of Denver, Denver Mayor John Hickenlooper, and Denver Police Officers Thomas McKibben and Chan Thanong for excessive force in 2005.

k.     Mary Milham was awarded a judgment at trial against the City and County of Denver for excessive force in 2002.

l.     David Nettles settled with the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Carlette Havard, Michael Nuanes, Jr., Damian Naranjo, and Zachary Phillips for excessive force in 2005.

---

[4] Michael Roberts, The City Council pays out to Timothy Thomason, The Westword, Aug. 19, 2008, available at http://blogs.westword.com/latestword/2008/08/the_city_council_pays_out_to_t.php.
[5] Christopher N. Osher, Denver Has Spent Nearly $6.2 Million Since 2004 to Settle Suits Against Police, The Denver Post, Sept. 15, 2010, available at http://www.denverpost.com/news/ci_16076344; Michael Roberts,15 Shocking Denver Brutality Incidents from the Marvin Booker Lawsuit, available at http://www.westword.com/news/15-shocking-denver-brutality-incidents-from-the-marvin-booker-lawsuit-60 52716.

m.      In 2007, Francisco Juan Lobato, Anthony Lobato, Barbara Lobato, and Ramona Lobato settled a lawsuit on behalf of the estate of Frank Lobato with the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Ranjan Ford, Jr., Joshua Herrick, Gene Sharla, Robert Shiller, Charles Kyle, Steven Addison, and unidentified John and Jane Doe Officers for $900,000 in 2007.[6]

n.      Hirut Berhanmeskel settled with the City and County of Denver and Denver Police Officer Gilberto Romero for excessive force in 2006.

o.      Chandler Lyles settled with the City and County of Denver and Denver Police Officer Ryan Burke for excessive force in 2006.

p.      Ross Edward Smith settled with the City and County of Denver and Denver Police Officers Jarrod Tinnin and Mark Sutton for excessive force in 2007.

q.      Grace Arlene Mosley settled with the City and County of Denver and Denver Police Officers Martin Martinez, Jose Hurtado, and unknown John Doe Officers for excessive force in 2007.

r.      In 2008, Juan Vasquez, a 16 year old boy, settled with the City and County of Denver and Denver Police Officers Charles Porter, Luis Rivera, and Cameron Moerman for $885,000.[7]

s.      In 2009, Trudy Trout settled with Denver Police Officer Nicholas Rocco-McKee's for $100,000 for use of excessive force.

---

[6] *Id.*
[7] David Packman, Is There a Police Brutality Problem in Denver?, INJUSTICE EVERYWHERE: THE NATIONAL POLICE MISCONDUCT STATISTICS AND REPORTING PROJECT, Sept. 6, 2010, available at http://www.injusticeeverywhere.com/?p=3028.

t.     Altagracia Medina Valencia on behalf of her deceased husband settled with the City and County of Denver, Denver Police Chief Gerry Whitman, and eight unknown John Doe Denver Police Officers for excessive force in 2009.

u.     Wayne C. Rose settled with the City and County of Denver, Denver Police Chief Gerald R. Whitman, Detective Mark S. Woodward, and unidentified John Doe Police Officers for excessive force in 2009.

v.     Michael DeHerrera settled with the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr. Mr. DeHerrera for excessive force in 2009 for $17,500.[8]

w.     Shawn Kyeone Johnson settled with the City and County of Denver and Denver Police Officers Devin Sparks, A. Jaramillo, and R. Murr for excessive force in 2009 for $15,500.[9]

x.     James B. Bouchard settled with the City and County of Denver and Denver Police Officers M. Whetstone and K. Jiminez for excessive force in 2009.

y.     Davis Smith filed suit with the City and County of Denver, Denver Police Chief Gerald Whitman, Denver Manager of Safety Alvin LaCabe, and Denver Police Officer Joseph P. Flynn for excessive force including injuries of a torn rotator cuff, a torn biceps tendon, and chronic back pain from 2009.

z.     In 2009, Alberto Romero settled with the City and County of Denver for a wrongful death lawsuit for $225,000.

---

[8] Christopher N. Osher, Denver Has Spent Nearly $6.2 Million Since 2004 to Settle Suits Against Police, The Denver Post, Sept. 15, 2010, available at http://www.denverpost.com/news/ci_16076344.
[9] David Packman, Is There a Police Brutality Problem in Denver?, INJUSTICE EVERYWHERE: THE NATIONAL POLICE MISCONDUCT STATISTICS AND REPORTING PROJECT, Sept. 6, 2010, available at http://www.injusticeeverywhere.com/?p=3028.

aa.     Vicki Lynn Trujillo on behalf of the Estate of Jason Gomez settled with the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officer Timothy Campbell for excessive force in 2009.

bb.      In 2015 James D. Moore settled with the City and County Police Officers Shawn Miller and John Roble for excessive force in 2009.

cc.     In 2010, Eric Winfield settled with the City and County of Denver and Denver Police Officers Antonio Milow, Thomas Johnston, and Glen Martin for excessive force in 2007 for $40,000.[10]\

dd.      Robert Duran won a $40,000 jury verdict against the the City and County of Denver and Denver Sheriff's Deputy Steven Koehler for excessive for including injuries of scalp lacerations, bruised ribs, chest contusions, and closed head injury from 2009.

ee.     August 2010, Denver paid Chad Forte $22,500 to settle a lawsuit resulting from Denver Police Officer Kenneth Johnson's use of excessive force. After Mr. Forte allegedly jaywalked, Officer Johnson followed him into his apartment building and jumped him from behind, leaving him with facial injuries.

ff.     On September 20, 2010, Rohit Mukherjee filed a lawsuit against Denver Police Officer Abbegayle Dorn and two unknown John Doe Denver Police Officers. Mr. Mukherjee alleged that Denver Police Officers knocked on his door while he was hosting a party in his apartment. One of the officers asked Mr. Mukherjee to step outside. When he refused, one of the officers pushed his way

---

[10] 6 Alan Prendergast, Eric Winfield: Artist Beaten by Denver Cops Gets Cash, No Apology, The Westword, May 4, 2010, available at
http://blogs.westword.com/latestword/2010/05/eric_winfield_artist_beaten_by.php.

into the apartment and Officer Dorn pinned Mr. Mukherjee against the door and choked him. When Mr. Mukherjee informed the officers that he could not breathe, one of them threw him to the ground, face first. One of the officers stood on Mr. Mukherjee's ankle and rocked back and forth. Once Mr. Mukherjee was restrained, the officers pushed him face first on the carpeted floor, causing contusions to his face. Mr. Mukherjee's guests then began recording the use of excessive force with their cell phones, at which point Officer Dorn took the cell phones without permission and placed them in a bowl of water in the kitchen in order to destroy the photographic and video evidence of the police misconduct. While Mr. Mukherjee was still restrained, the other officers stepped on and kneed Mr. Mukherjee's face and bent his fingers backwards as far as they could without breaking them. While escorting Mr. Mukherjee out of his apartment, the officers slammed his head into the hallways walls and the elevator wall. Mr. Mukherjee's injuries included jaw injuries, bruises, hand and knee pain, lacerations, knee contusion, hand sprain, and nerve damage. The case was settled in 2011 for an undisclosed amount of money.

gg.   In 2015 a trial award was entered against the City and County of Denver and Denver police officers for Daniel Martinez, Jr. for $200,000; Nathan Martinez for $237,500; Daniel Martinez III for $140,000; and Jonathan Martinez for $450,000 for excessive force.

hh.   On January 11, 2011, Alexander Landau Alexander Landau sued the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police

Officers Randy Murr, Ricky Nixon, and Tiffany Middleton. Mr. Landau alleged that he was assaulted during a traffic stop. Mr. Landau was driving with Addison Hunold when he was pulled over. Mr. Landau did not have his wallet, so he could not provide any identifying information to the officers. He exited the car as instructed. Mr. Hunold informed the officers that he had a small amount of marijuana and he was placed in handcuffs. The officers began searching Mr. Landau's car. When they tried to open the trunk, Mr. Landau asked if they had a warrant authorizing a search of the trunk. Two of the officers then grabbed each of Mr. Landau's arms, and a third officer punched him in the face with no provocation. One of the officers then yelled that Mr. Landau was going for a gun (which was false, but which demonstrates that police officers in Denver are trained to yell "gun!" when they see one, something that Defendant Motz did not do in this case). The officers continued to beat him in the face and head with their fists, a radio, and a flashlight. Denver police spewed racist epithets at Mr. Landau, who is African American. More officers arrived on the scene and joined the assault. Officer Murr pointed his gun at Mr. Landau's head and threatened to shoot him. Paramedics arriving on the scene documented that Mr. Landau was found lying prone on the curbside, handcuffed behind his back, bleeding from the head, with lacerations and in acute distress. Mr. Landau was transported by ambulance to the hospital, where he was treated for a broken nose, lacerations, and serious closed head injuries, including a large hematoma, a concussion, and a hemorrhage in his right eye. Immediately after assaulting Mr. Landau Denver police officers

began the cover-up. They pressured an on-scene witness to sign a false statement and filed false reports about the incident. The IAB investigation into the assault was conducted for the purpose of exonerating the officers involved. Ultimately, no officer was disciplined, either for lying or assaulting Mr. Landau. The case settled with Denver agreeing to pay Mr. Landau $795,000.

ii.    Arising out of an incident in July 2009, the City paid $360,000 to Ana Ortega and three other women who were assaulted with mace and hands-on excessive force outside of the Denver Diner. Officers who were repeat players in these excessive force incidents were allowed to continue working at the Denver police department.

jj.    The City and County of Denver made a six million dollar payment to Marvin Booker for his homicide in the Denver jail at the hands of multiple individual deputy sheriffs, and the payment of 3.25 million dollars to Jamal Hunter who was tortured, attacked and had his genitals scalded when hot water was thrown on his groin.

kk.    Arising from conduct on July 1, 2005, when Jeffrey R. Mayton alleged that Denver Police used excessive force against him in retaliation for his voicing medical needs after he was already arrested, causing significant injuries.

ll.    Arising from conduct on August 5, 2005, when Quincy Michael Shannon alleged that Denver Police assaulted him with mace or pepper spray and other excessive force for no justifiable reason.

mm.     Arising from conduct on January 6, 2006, the estate of Frank Lobato alleged that Denver Police shot and killed Mr. Lobato who was sleeping in his bed and had done nothing to justify any force at all.

nn.     Arising from conduct on August 11, 2006, Chandler Lyles alleged that Denver Police tackled and arrested him for no reason, breaking his clavicle.

oo.     Arising from conduct on June 27, 2007, Grace Arlene Mosley alleged that Denver Police unlawfully arrested her with excessive force causing pain.

pp.     Arising from conduct on May 15, 2009, Altagracia Medina Valencia alleged that Denver Police tased her husband to cause him to drop a knife, but then shot and killed him in front of his family after he had dropped the weapon and without justification.

qq.     Arising from conduct on October 16, 2009, Wayne C. Rose alleged that Denver Police knocked him to the ground while he was fleeing police, unarmed, and ran over him with a motorcycle, handcuffed him while unconscious and beat and kicked him repeatedly while unconscious.

rr.      Arising from conduct on June 30, 2009, Denver settled a lawsuit related to the excessive force used on Michael DeHerrera. Although Officers Sparks and Murr were briefly terminated by the Manager of Safety based upon their excessive force and falsification of official reports, Denver decided to reinstate both of them to employment.

ss.     Arising from conduct on June 30, 2009, Shawn Kyeone Johnson alleged that Denver Police joined in with a bouncer at a club and beat him without any justification.

tt.     In June 2010, Tyler Mustard filed a lawsuit alleging that Denver Police chased him, tackled him and beat him in the head, neck and body.

uu.     In May of 2012, Philip White, a 77 year old blind man was arrested after a Denver Officer Kyllion Chafin slammed his head into a counter. Mr. White was awarded $400,000 for excessive force.

vv.     Denver City Counsel approved a $1.6 million settlement for Daniel Martinez Jr. and his two sons who were assaulted by officers, arrested on misdemeanor assault charges and the cases were either dismissed by prosecutors or acquitted at trial.

ww.    In May of 2022, Nicholas Munden was subjected to excessive force by the use of a stun gun by Michael Pineda even that Mr. Munden was not threatening anyone or engaged in any conduct which would have justified such use of force.

xx.     Denver Police used excessive force and retaliated against hundreds or thousands of protesters during the George Floyd protests over the summer of 2020, resulting in over 100 hundred individuals bringing civil rights lawsuits for excessive force and violating individuals' first amendment rights. In 2022, Denver was found to have violated the rights of 12 protesters and $12 million was awarded to these 12 individuals.

yy.     On June 3, 2016, Gregory Heard, an unarmed African American homeless man, was subjected to unreasonable and excessive force by Denver Police Officer Greg Dulayev, who tased him and shoved his face into the dirt while he was unarmed and obviously complying with officer commands to surrender.

After tasing and shoving Mr. Heard to the ground, Officer Dulayey, another Denver police officer present at the scene, and the Denver Investigating Supervisor, knowingly prepared false police reports in an overt effort to cover up Officer Dulayey's grossly excessive force. They thus falsely asserted that Mr. Heard was disobeying police commands, aggressively advancing towards and threatening the officers, when in fact he was doing nothing at the time besides complying with Officer Dulayey's instructions to come out from behind the bushes. After a sham investigation, the DPD and IAB determined that Officer Dulayev's conduct was consistent with policy and his training as a Denver Police Officer, and that Officer Dulayey had not violated the rights of Mr. Heard.

zz.     In late June, 2020, Denver officer Greg Dulayev rammed a baton into Michael Jacobs' annus in responding to a protest. Denver has settled this suit for $350,000.

aaa.    In 2009, Denver police officers Randy Murr, Ricky Nixon, and Tiffany Middleton beat Alex Landau during a vehicle stop. Mr. Landau suffered a broken nose, lacerations and closed head injuries. Ultimately, Denver settled this civil rights suit for $795,000.

bbb.    In 2021, Mr. Dulayev yet again engaged in excessive force against Rebecca Allison Clark. Denver ultimately settled this lawsuit for $45,000.

ccc.    In 2014, Denver police officers killed Ryan Ronquillo while he was unarmed, resulting in a civil rights lawsuit for excessive force.

ddd.    On January 1, 2019, DPD Officers Daniel Felkins and Robert Blanc viciously beat and tased Justin Lecheminant in his own backyard after he drove away from a traffic stop. The officers broke his nose, punctured his eardrum, broke multiple of his ribs, and inflicted a serious concussion on him. After punching Mr. Lecheminant, officer Blanc can be heard saying "this is why you get when you elude police."

eee.    On January 26, 2017, DPD officers pulled over Kristyn Stonkas as she parked in the alley behind her home. When Ms. Stonkas and her partner Quennel Steele yelled at the officers, they responded by violently taking down, handcuffing, and beating the couple. DPD officers caused Ms. Stonkas a traumatic brain injury and a torn vertebrae in her neck, and caused Mr. Steele a traumatic brain injury, a collapsed lung, and a fractured rib. In 2019, Denver settled the couple's excessive force claims against Denver and its officers (before the couple filed a lawsuit) for $500,000.

fff.    In July 2014, DPD Officer James Medina pinned Seryina Trujillo to the floor of her jail cell with his knee on her neck. Officer Medina was fired for his use of obviously excessive force, and in 2019, Denver settled Ms. Trujillo's excessive force lawsuit.

ggg.    Also in July 2014, Denver paid Jamal Hunter a $3.25 million settlement to resolve a case involving multiple instances of wrongdoing by Denver and DSD deputies. On July 18, 2011, Mr. Hunter was the victim of a fellow inmate's violent attack that was enabled by the complicity of Deputy Gaynel Rumer, who initially received a mere 40-day suspension. Part of Deputy Rumer's misconduct included failure to conduct proper rounds. Then, on July 31, 2011, Mr. Hunter was attacked and choked by Deputy Edward Keller. This incident

was not reviewed despite Mr. Hunter's grievance until after the initiation of his lawsuit. In connection with the Hunter litigation, Judge Kane asked federal authorities in June 2014 to investigate the "patterns and practices" of the Denver police and sheriff's offices and suggested they were intimidating a key witness, saying that a Denver police investigation "smacks of a sham."

hhh.      In September 2014, Denver Sheriff's Deputy Thomas Ford punched inmate Kyle Askin in the face multiple times while he was handcuffed. Denver fired the deputy, but he was reinstated by the civil service commission. Denver settled Mr. Askin's claims for $65,000.

iii.      In July 2014, Denver Police Officer Choice Johnson violently assaulted Brandon Schreiber at a bar in Denver. Officer Johnson tore both of Schreiber's rotator cuffs. Officer Johnson had a long history of using excessive force, including at least nine excessive force complaints filed against him. Denver settled Mr. Schreiber's claims for $185,000.

jjj.      On May 22, 2012, Plaintiff Philip White, a blind 77-year-old man, was assaulted by Denver Police Officer Kyllion Chafin at the Greyhound bus station in downtown Denver. Because Mr. White failed to leave the Greyhound station while waiting for his bus back to Vail, Officer Chafin slammed Mr. White's head into a ticket counter, causing a bloody gash on his head, and applied overly tight handcuffs to his wrists. Denver IAB found that Officer Chafin had neither violated department policy nor used excessive force in his interaction with Mr. White despite significant evidence that Officer Chafin had used excessive force on a small, elderly blind man who had committed no

crime. In October 2015, a federal jury returned a verdict against Officer Kyllion Chafin on Mr. White's excessive force claim, and awarded Mr. White $100,000 in compensatory damages and an additional $300,000 in punitive damages, for a total verdict of $400,000. The City paid that verdict plus several hundred thousand dollars in attorney fees, foregoing their right to appeal the jury verdict.

kkk.   On January 12, 2011, Daniel Martinez, Jr., Nathan Martinez, Daniel Martinez III, and Jonathan Martinez (collectively, "the Martinez Family") filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, and Denver Police Officers Jason Valdez, Robert Martinez, Robert Motyka, and Bryce Jackson. The Martinez Family alleged that the officers began pounding on their door shortly after 11:00 pm, demanding that they open the door. When Daniel Martinez, Jr. opened the door slightly, the officers rushed into the house without consent or a warrant. Officer Valdez slammed Jonathan Martinez's head through a window and then pulled him outside of the house and slammed him onto the concrete to apply handcuffs. Officer Martinez pushed Daniel Martinez into the living room, pinned him against the sofa, and applied handcuffs. Officer Motyka punched Nathan Martinez in the face without any provocation. Officer Jackson forcefully dragged Daniel Martinez III from the house and slammed him into the concrete before applying handcuffs. All of the Martinez Family members were criminally charged. A jury acquitted Nathan Martinez and Daniel Martinez III on all charges. All of the charges against Daniel Martinez, Jr. and Jonathan Martinez were dropped.

The Martinez family was awarded $1,800,000 by a federal jury in September of 2014.

lll.     On November 23, 2010, Jared Lunn filed a lawsuit against the City and County of Denver, Denver Police Officer Eric Sellers, and unknown Denver Police Officer John Doe. Mr. Lunn alleged that after he attempted to report an assault to Officer Sellers, which Officer Sellers ignored, Officer Sellers assaulted him. Mr. Lunn was attempting to get into his friend's vehicle when he muttered, "way to protect and serve," in response to Officer Sellers' refusal to take his assault report seriously. Officer Sellers then wrapped his arm around Mr. Lunn's neck to pull him out of the car. Officer Sellers placed Mr. Lunn in a carotid compression hold. After Mr. Lunn went limp, Officer Sellers kicked his legs out from under him and threw him to the ground. After handcuffing Mr. Lunn, Officer Sellers got within inches of Mr. Lunn's face and yelled homophobic epithets at him. Officers Sellers then released Mr. Lunn without citing him for violation of any law and allowed him to go home. In June 2011, Denver settled the case for $45,000.

mmm.    In June 2010, John Crespin filed a lawsuit against the City and County of Denver and Denver Police Officers Steven Castro, Todd Allum, Eric Sellers, and Joey Gasca. According to the lawsuit and media accounts, the officers followed 17-year-old Crespin home after he witnessed them using excessive force on a group of kids. Witnesses saw the officers kick Crespin's legs out from under him, use a chokehold on him, cuff him, and beat him with police batons for 15-20 minutes. This case was settled in 2012 for an undisclosed amount of money.

nnn.    19. On March 16, 2010, Mark Ashford was walking his dogs when he witnessed Denver Police Officers pull over a driver for allegedly going through a stop sign. When Mr. Ashford informed the driver that he would be willing to

testify that he saw the driver come to a complete stop, the officers focused on Mr. Ashford. When he began taking pictures of the scene, the officers attempted to wrestle the camera from Mr. Ashford, pushing, grabbing, and attempting to punch him to get him to the ground. Mr. Ashford was charged with interference and resistance, but the charges were later dismissed. Mr. Ashford was transported from the scene by ambulance. He subsequently filed an excessive force complaint with the DPD. In June 2011, Denver settled the case for $35,000.

ooo.   On August 10, 2009, Danvis Smith filed a lawsuit against the City and County of Denver, Denver Police Chief Gerald Whitman, Denver Manager of Safety Alvin LaCabe, and Denver Police Officer Joseph P. Flynn. Mr. Smith alleged that he was involved in an altercation with Officer Flynn, who was working on foot in the Denver International Airport parking garage. Officer Flynn reached through the driver's side window and struck Mr. Smith in the mouth with his elbow. Officer Flynn then pulled Mr. Smith out of the car by his right arm and handcuffed Mr. Smith in an awkward position, with his arms lifted high in the air beyond the normal range of motion. Mr. Smith was charged with assault, but all charges against him were subsequently dropped. Mr. Smith's injuries included a torn rotator cuff, a torn biceps tendon, and chronic back pain. The case was settled for an unknown amount.

ppp.   On July 19, 2009, multiple Denver police officers assaulted four women outside of the Denver Diner. None of the women had committed, or were accused of committing, any crime and, in fact, the officers had been called because one of the women they ended up brutally assaulting was the victim of an assault in the diner's bathroom. Police maced all of the women, and further brutalized two of the women while they were handcuffed. After the incident, Denver initiated a cover-up of the brutality and excessive force by prosecuting the women. Upon information and belief, neither officer was disciplined.

Certainly, neither officer was fired or criminally prosecuted. The City of Denver paid $360,000 to settle the claims.

qqq.   On May 4, 2009, Jason Anthony Graber filed a lawsuit against the City and County of Denver and Denver Police Officers Miller, Davis, and two other unknown John Doe Officers. Mr. Graber alleged that, as he was crossing the 16th Street Mall at Market Street, a police officer in a marked car yelled out his window, "dumbass!" The police car then pulled up next to Mr. Graber, his brother, and his wife, and asked if they needed assistance. Mr. Graber responded that they did not need assistance, but that he did not appreciate being called a dumbass. The officers then exited their vehicle and one of them tackled Mr. Graber from behind. He was grabbed by the neck, and his legs were kicked out from under him. He fell down, slamming his knee and elbow onto the concrete. Mr. Graber was arrested for public intoxication, but a breathalyzer test showed a blood alcohol content of 0.036, well below the legal limit, and he was released. X-rays to Mr. Graber's leg showed lipohemarthrosis and a possible hairline fracture. Mr. Graber remained in a leg brace for many months after the incident. Judge Kane determined that Denver had improperly impeded appropriate discovery in this case by refusing to produce documents regarding previous uses of force by Denver law enforcement personnel. The case was settled for $225,000 in 2011.

rrr.   On April 30, 2009, John Stephen Heaney filed a lawsuit against the City and County of Denver and Denver Police Officers James Costigan, Michael Cordova, Noel Ikeda, Luke Palmitere, and Daniel Steele. Mr. Heaney alleged that, while he was riding his bicycle near Coors Field on opening day of the

baseball season, he was attacked by undercover police officers, who did not identify themselves as law enforcement agents. He was placed into a chokehold and forcibly brought to the ground, where he was punched in the head repeatedly. One of the officers grabbed him by the hair and slammed his face into the pavement, breaking two of his teeth. As a result of the excessive force used against him, Mr. Heaney also suffered severe bruising on his hands, knees, arms, and legs, as well as other injuries requiring surgery. The case was resolved by the two parties.

sss.   On January 26, 2017, Kristyn Stonskas and Quennel Steele were stopped by Denver police. During the arrest, Denver police officers took Ms. Stonskas to the ground, causing a traumatic brain injury, torn vertebrae in her neck, a collapsed lung, and a fractured rib. Denver settled this case for $500,000.

ttt.   In 2018, Denver police officers beat Malow Malek with a nightstick while he was dancing high on drugs. They broke several bones including in his face. Denver settled this case for $1.2 million.

33. The Denver Police have a history of targeting activists and protesters. The Denver Police do not like protesters, and they have a special ire for those who protest police abuses. This history of targeting and retaliation amounts to a custom, policy, or practice of arresting, intimidating, or otherwise retaliating against protesters and journalists for engaging in speech activity including speech that is critical of the police at public places in the City of Denver.

34. For decades, the Denver Police maintained a list of known activists and protesters with secret spy files on more than 3,200 people and 208 organizations. For most of these

people and organizations, their only conduct was attending peaceful demonstrations. The Denver Police kept files on them anyway. During this period, Denver Police officers spied on certain protest leaders. Ultimately, the Denver Police agreed to end certain practices aimed at policing free-speech activities.[11]

35. This however, was not the end of the Denver Police's targeting of activists and demonstrators. Denver now monitors the social media accounts of activists.[12]

36. On the evening of August 25, 2009, during the Democratic National Convention, a solid line of riot-equipped police shut down a peaceful protest march as it proceeded on 15th street in downtown Denver. A second line of riot cops encircled the protesters and conducted a mass arrest of those protesters for marching without a permit. Without probable cause, the Denver Police arrested 96 peaceful protesters. The Denver Police charged the protesters with failing to observe a dispersal order, even though they later acknowledged that no such order was ever given. Nonetheless, the Denver Police continued to target these protesters, refusing to drop the charges. The protesters eventually prevailed on these charges and brought a civil rights action. *Acks v. Denver*, 1:09cv02197. Denver later agreed to a Class Action settlement for depriving these protesters of their constitutional rights.

37. In the fall of 2011, the Denver Police targeted Occupy protesters, arresting dozens and deploying pepper balls in response to peaceful protests. Many of those demonstrators

---

[11] ACLU Press Release: ACLU and Denver Officials Agree to Resolve Lawsuit Over Notorious Police "Spy Files", April 17, 2003, https://www.aclu.org/press-releases/aclu-and-denver-officials-agree-resolve-lawsuit-over-notorious-police-spy-files
[12] Denver Police Use Social Media to Follow Activists, Bring Back Fears of Spy Files, Westword Magazine, January 17,2017, https://www.westword.com/news/denver-police-use-social-media-to-follow-activists-bring-back-fears-of-spy-files-8696953

would continue to protest Denver Police violence and the treatment of the homeless for the years to come.

38. On or about September 11, 2013, Bruce Baumann attended a public event on the University of Denver campus in remembrance of 9/11. One of the speakers was former Senator Joseph Lieberman. While Senator Lieberman was speaking, Mr. Baumann stood up and began asking Mr. Lieberman a series of questions. Throughout these questions, Mr. Baumann was exercising his First Amendment rights. Soon thereafter, Mr. Baumann was asked to leave, with which he immediately complied. A Denver police officer, not liking the content of Mr. Baumann's message, arrested him. The criminal charge of Disturbing the Peace was later dropped. After losing a Motion to Dismiss on a federal civil rights case arising out of this incident, the City of Denver settled this case.

39. On August 14, 2014, Levi Frasier witnessed DPD officers punch an unarmed civilian numerous times in the head and trip a heavily pregnant woman, causing her to fall to the ground. Believing the officers were committing illegal acts of misconduct, Mr. Frasier video-recorded the officers with his tablet. Upon seeing Mr. Frasier recording, DPD officers surrounded Mr. Frasier, threatened him with arrest, and demanded he turn over his video. Mr. Frasier refused, and a DPD officer seized his tablet from him and searched it illegally. On the plaintiff's motion to reconsider, Judge Blackburn of the U.S. District Court for the District of Colorado reinstated the plaintiff's First Amendment retaliation claims against the officer defendants and granted Denver's motion for summary judgment. Despite Denver's policy and training on the First Amendment, the officers nonetheless violated Mr. Frasier's First Amendment right to gather and record information on matters of public concern.

40. In July 2015, Eric Brandt and Mark Iannicelli began handing out fliers regarding the concept of jury nullification in front of the Lindsey-Flanigan Courthouse in Denver. On August 26, 2015,

41. On July 5, 2018, Susan Greene, a journalist, was driving to the bank when she saw a black man handcuffed and naked on the sidewalk across from the State Capitol Building surrounded by DPD officers. Concerned as a public citizen and journalist by the questionable appearance of an African-American man unclothed, nonthreatening, and in handcuffs, Ms. Greene parked her vehicle and began to take pictures on a public sidewalk where she was not obstructing police investigation. DPD officers told her to stop. Ms. Greene stated that it was a public sidewalk and that she had the right to take photos. The officers falsely accused Ms. Greene of violating the arrestee's HIPAA rights and of blocking the door to an ambulance. The officers then forcefully and painfully arrested Ms. Greene in retaliation for exercising her First Amendment right to photograph the police on a public sidewalk, and handcuffed her for ten minutes before releasing her. Ms. Greene was never charged with a crime. Ms. Greene's First Amendment, First Amendment retaliation, and Fourth Amendment excessive force claims against Denver and DPD officers were settled in August 2019 for $50,000 in addition to mandating First Amendment training for DPD officers.

42. On September 23, 2018, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD Officers for alleged trespassing while handing out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never provided with a trespass notice advising her that she was not permitted to be on the property, and instead, officers arrested her in retaliation for engaging in First

Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the Denver Detention Center. Her case is currently ongoing.

43. Again on September 23, 2018, Brian Loma and Mikel Whitney were on the 16th Street Mall distributing meals to the homeless with Ms. Sodaro. Shortly after Ms. Sodaro's arrest, Mr. Loma decried the treatment of homeless people - "what we have here [are] … laws that criminalize people who can't pay rent. They don't want your tourist dollars to recognize that we have problems in this city! The laws say that if you're not paying money, you can't sit down." As he continued, Mr. Loma shouted "fuck the police!" He was immediately arrested for disturbing the peace. Mr. Loma and Mr. Whitney have filed a 1983 civil rights claim which is currently ongoing.

44. On September 24, 2018, Eric Brandt was in the Sixteenth Street Mall protesting the arrests of Ms. Sodaro, Mr. Loma, and Ms. Whitney. Mr. Brandt stood on a public sidewalk and shouted, "we want justice for Caryn Sodaro! Caryn Sodaro is a political prisoner for free speech!" Defendant Kitchens, Defendant Cpl. Chavez, and three other officers were present and closely watching Mr. Brandt. Defendant Kitchens expressed his annoyance and stated loud enough for other people in the mall to hear, "unfortunately, we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to arrest him." A woman standing nearby stated that she was offended and would sign a complaint. Defendants Kitchens and Cpl. Chavez then arrested Mr. Brandt in retaliation for his protected speech and cited him with disturbing the peace. Upon making the arrest, Defendant Cpl. Chavez radioed Defendant Guzman explaining that they had Mr. Brandt in custody and that a private citizen was willing to sign a complaint against him. Guzman explained that as long as they had one signed complaint against him, then the arrest was

ok. After spending two days in jail, Mr. Brandt was released and his charge was dropped the next day, on September 27, 2018.

45. On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael McDaniel, and other similarly situated Plaintiffs protested in Denver to express their outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated the plaintiffs' First Amendment right to free speech and their Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish the plaintiffs for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the defendants in violation of the plaintiffs' First and Fourth Amendment rights and issued a temporary restraining order to enjoin Denver and DPD from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protest.

46.  In addition to the brutalization of protestors, DPD officers have also repeatedly used unlawful, excessive force against journalists in violation of the First Amendment. On June 1, 2020, members of the Colorado Freedom of Information Coalition, Colorado Press Association Network, Colorado Broadcasters Association, and Colorado Pro Chapter of the Society of Professional Journalists reported seven journalists or reporters had been subjected to use of force by DPD officers while reporting on protests in Denver. DPD officers hit these reporters with pepper balls, projectiles, or tear gas simply for being present at protests in violation of the First Amendment.

47. These are only a select few of the stories of Denver Police targeting protesters, whether for their viewpoint, the manner in which these protesters communicated their message, or simply because the Denver Police do not like the act of protesting.

48. Upon information and belief, the Denver Police have engaged in a concerted effort to target a few of these individuals and their associates, including Eric Brandt, Kyle Shockley, and Abade Irizarry.

49.  Given Denver's history and widespread practice of unlawful arrests and excessive force in retaliation against the exercise of First Amendment rights, Defendant Denver knew of the need to provide additional or better training and supervision in this respect and made a deliberate choice to not adequately train and supervise DPD officers on the protections of the First Amendment violations.

50. Defendant Denver knew or should have known that its acts or omissions in this regard were substantially certain to cause DPD officers to violate individuals' constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to the policy and custom of failing to provide additional or better training and supervision to DPD officers regarding the protections of First Amendment.

51. Defendant Denver could have and should have pursued reasonable methods for the training and supervising of such employees, or disciplining them if they engaged in misconduct, but intentionally chose not to do so.

52. Defendant Denver's custom, practice, and policy of encouraging, condoning, and ratifying the use of arrests or other retaliatory conduct against those who exercise their First Amendment rights, and their custom, policy, and practice of failing to properly train, supervise, and discipline DPD employees despite such history and knowledge or

constructive knowledge of such history, were the moving force and proximate cause of the violations of Plaintiffs' constitutional rights.

53. In 2011, the Citizen Oversight Board (COB) for the City and County of Denver reported a systemic problem within the Denver Police Department concerning the degrading quality of internal affairs investigations into officer misconduct.

54. As the COB noted, IAB investigators often ask leading and suggestive questions that appear to be designed to guide officers and/or witnesses to give answers that will lead to lesser discipline or no discipline at all for the subject officers.

55. The COB also noted that there was a reluctance by DPD to investigate or bring allegations of inappropriate force and/or lying, despite the fact that it may be appropriate to do so.

56. The COB also found that there was a tendency by IAB to, at times, reflexively justify and defend officer conduct, especially in cases involving allegations of unlawful entry, search and seizure, use of force, or departing from the truth.

57. Lastly, the COB found a tendency by IAB and senior staff to, at times, reflexively assume that the credibility of officers is superior to that of citizen complainants and witnesses, regardless of any underlying motivation to lie or illogic in an officer's version of an event.

58. In 2011, Independent Monitor Richard Rosenthal stated in his Fourth Quarter, 2011 report that "[t]he Monitor's Office has noted, during the past year, that there has been a high level of resistance to OIM recommendations intended to ensure thorough and complete investigations and appropriate documentation of those investigations. The problems identified in the above noted cases relate to basic investigative steps that should have

been taken, but were not. Bias on the part of Internal Affairs Bureau Investigators and supervisors has been documented in many cases over the past year. As such, the Internal Affairs Bureau staffs' actions could reduce the likelihood, in certain cases, of officers receiving discipline pursuant to the new Disciplinary Matrix. It is the opinion of the Monitor that these cases evidence substantial problems in the way the Denver Police Department is currently policing itself."

59. From 1997 to 2010, there were 1,633 reported unnecessary force complaints against members of the DPD. For this 14 year period, 20 complaints were actually sustained resulting in a sustained rate of 1.2 percent.

60. In a study by the United States Department of Justice in 2002, their results indicated that in all large law enforcement agencies (more than 100 officers), eight percent of all unnecessary force complaints resulted in findings of sustained.

61. Moreover, Denver has a history of ignoring repeated complaints and even findings of excessive force by its officers, including Cody Lane, Choice Johnson, and Greg Dulayev.

62. In 2018, Dan Montgomery, formerly the Chief of Police for Westminster, after reviewing Denver's Internal Affairs Bureau, concluded that "Denver has a long history of problems associated with its internal affairs investigation function, and in my opinion that history of problems was alive and well." 1:16-cv-02327-JLK-MEH, Doc. 93-12 (D. Colo.).

63. Indeed, after the George Floyd protests in which hundreds of people were subjected to excessive force, only four (4) officers have been disciplined for excessive force even though more than 125 complaints of excessive force were made.

64. Often, Denver failed to take such complaints seriously and approaches the Internal Affairs Bureau as a clearinghouse for complaints as opposed to a department dedicated to rooting out dangerous police officers.

65. In total, Denver has a custom or practice of using excessive force, a custom or practice of failing to train, supervise, or discipline its officers, and simply does not discipline officers for excessive force, including Defendant Cody Lane.

### STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Colo. Const. Art. II, Section 7 – C.R.S. § 13-21-131 – Excessive Force
### (Plaintiff vs. Defendant Lane)

66. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

67. Defendant acted under color of state law, and within the course and scope of his employment, in his capacities as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

68. Defendant Lane is a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

69. Plaintiff had a protected interest under Colo. Const. Art. II, Section 7 to be secure in his person against unreasonable searches and seizures, including through the use of excessive force in carrying out a seizure of his person.

70. Defendant did not have, at any time, a legally valid basis to seize Plaintiff.

71. Defendant unlawfully seized Plaintiff by means of excessive physical force.

72. Defendant had no warrant authorizing any seizure of Plaintiff.

73. Defendant's actions were objectively unreasonable in light of the circumstances

confronting them.

74.  Plaintiff had committed no crime (nor could the Defendant have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave Defendant no reason to fear for his safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

75.  Defendant did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

76.  Defendant's actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

77.  Defendant engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

78.  As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

79.  Defendant's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

80.  Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

**SECOND CLAIM FOR RELIEF**
**Colo. Const. Art. II, Section 25 – C.R.S. § 13-21-131 — Excessive Force**

**(Plaintiff vs. Defendant Lane)**

81.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

82.    Defendant acted under color of state law, and within the course and scope of his employment in his capacities as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

83.    Defendant is a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

84.    Plaintiff had a protected interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

85.    Defendant did not have, at any time, a legally valid basis to seize Plaintiff.

86.    Defendant unlawfully seized Plaintiff by means of excessive physical force.

87.    Defendant had no warrant authorizing any seizure of Plaintiff.

88.    Defendant's actions were objectively unreasonable in light of the circumstances confronting them.

89.    Plaintiff had committed no crime (nor could the Defendant have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave the Defendant no reason to fear for his safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

90.    Defendant did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

91.    Defendant's actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

92.   Defendant engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

93.   As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

94.   Defendant's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

95.   Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

**THIRD CLAIM FOR RELIEF**
**Colo. Const. Art. II, Section 10 – C.R.S. § 13-21-131 — Freedom of Speech and**
**Assembly**
**(Plaintiff vs. Defendant Lane)**

96.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

97.   Defendant acted under color of state law and within the course and scope of his employment, in his capacity as an officer of the DPD at all times relevant to the allegations in this Complaint.

98.   Defendant is a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

99.   Plaintiff was engaged in protected expression by gathering to protest police brutality

and the Devner police response to homelessness.

100.    The actions of Defendant would chill a reasonable person from engaging in activity protected by Article II, Section 10 of the Colorado Constitution.

101.    Plaintiff's expression was on a matter of public concern and did not violate any law.

102.    Plaintiff's expression occurred in a traditional public forum.

103.    Defendant's actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

104.    Defendant's actions were not a reasonable time, place, and manner restriction on speech.

105.    Defendant's conduct stopped Plaintiff from the ability to continue recording without a constitutional basis.

106.    Defendant engaged in his conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

107.    As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

108.    Defendant's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain, and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

109.    Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

**FOURTH CLAIM FOR RELIEF**
**Colo. Const. Art. II, Section 10 – C.R.S. § 13-21-131 — Retaliation**
**(Plaintiff vs. Defendant Lane)**

110.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

111.   Defendant acted under color of state law, and within the course and scope of his employment, in his capacity as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

112.   Defendant is a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

113.   Plaintiff was engaged in protected expression by filming Denver Police officers.

114.   The actions of Defendant would chill a reasonable person from engaging in activity protected by Article II, Section 10 of the Colorado Constitution.

115.   Plaintiff's expression was on a matter of public concern and did not violate any law.

116.   Plaintiff's expression occurred in a traditional public forum.

117.   Defendant responded to Plaintiff's protected activity with retaliation.

118.   Defendant's retaliatory actions were substantially motivated by Plaintiff's exercise of their protected rights.

119.   Defendant engaged in his conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

120.   As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

121.   Defendant's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited

to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

122.    Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

**FIFTH CLAIM FOR RELIEF**
**Colo. Const. Art. II, Section 25 – C.R.S. § 13-21-131 — Retaliation**
**(Plaintiff vs. Defendant Lane)**

123.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

124.    Defendant acted under color of state law, and within the course and scope of his employment, in his capacity as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

125.    Defendant is a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

126.    Plaintiff was engaged in protected expression by filming Denver Police officers.

127.    The actions of Defendant would chill a reasonable person from engaging in activity protected by Article II, Section 10 of the Colorado Constitution.

128.    Plaintiff's expression was on a matter of public concern and did not violate any law.

129.    Plaintiff's expression occurred in a traditional public forum.

130.    Defendant responded to Plaintiff's protected activity with retaliation.

131.    Defendant's retaliatory actions were substantially motivated by Plaintiff's exercise of their protected rights.

132.   Defendant engaged in his conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

133.   As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

134.   Defendant's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

135.   Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

## SIXTH CLAIM FOR RELIEF
### 42 U.S.C. 1983 - Fourth Amendment - Excessive Force
### (Plaintiff vs. All Defendants)

136.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

137.   Defendants acted under color of state law, and within the course and scope of their employment, in their capacities as law enforcement officers for the FCPD at all times relevant to the allegations in this Complaint.

138.   Defendants are "persons" under 42 U.S.C. § 1983.

139.   Plaintiff had a protected Fourth Amendment interest against being victimized by the use of excessive force at the hands of law enforcement personnel.

140.   Defendants did not have, at any time, a legally valid basis to seize Plaintiff.

141.   Defendants unlawfully seized Plaintiff by means of excessive physical force.

142.    Defendants had no warrant authorizing any seizure of Plaintiff.

143.    Each Defendant failed to intervene to prevent the other Defendants from violating Plaintiff's constitutional rights and is thereby liable for such failure to intervene.

144.    Defendants' actions were objectively unreasonable in light of the circumstances confronting them.

145.    Plaintiff had committed no crime (nor could any of the Defendants have reasonably believed they had committed any crime) that would legally justify arrest or detention, Plaintiff gave the officers no reason to fear for their safety, Plaintiff was obviously unarmed, and Plaintiff was not resisting arrest or fleeing.

146.    Defendants did not have a legally valid basis to seize Plaintiff in the manner and with the level of force used under the circumstances presented.

147.    Defendants' actions, as described herein, were objectively unreasonable in light of the facts and circumstances confronting them.

148.    At the time when Defendants used excessive force against Plaintiff, Plaintiff had a clearly established constitutional right under the Fourth Amendment to the United States Constitution to be secure from unreasonable seizure through excessive force. Any reasonable law enforcement officer knew or should have known of this clearly established right.

149.    Defendants engaged in these actions intentionally, willfully, and wantonly, demonstrating deliberate indifference to, and a reckless disregard for, Plaintiff's constitutionally protected rights.

150.    Defendant Denver has a custom and practice of permitting Denver Police officers to engage in excessive force.

151.   Defendant Denver has a custom and practice of permitting Denver Police officers to engage in excessive force through failing to supervise and discipline officers when they engage in excessive force.

152.   Denver fails to train, supervise, and discipline its officers when it comes to excessive force.

153.   As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described herein, Plaintiff suffered injuries, damages, and losses.

154.   Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the vigil, and other compensatory and special damages.

155.   Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

### SEVENTH CLAIM FOR RELIEF
### 42 U.S.C. 1983 - First Amendment - Freedom of Speech
### (Plaintiff vs. All Defendants)

156.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

157.   Defendant Lane acted under color of state law and within the course and scope of his employment, in his capacity as an officer of the DPD at all times relevant to the allegations in this Complaint.

158.   Defendant Lane is a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

159.   Plaintiff was engaged in protected expression by gathering to protest police brutality

and the Devner police response to homelessness.

160.    The actions of Defendants would chill a reasonable person from engaging in activity protected by Article II, Section 10 of the Colorado Constitution.

161.    Plaintiff's expression was on a matter of public concern and did not violate any law.

162.    Plaintiff's expression occurred in a traditional public forum.

163.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

164.    Defendants' actions were not a reasonable time, place, and manner restriction on speech.

165.    Defendants' conduct stopped Plaintiff from the ability to continue recording without a constitutional basis.

166.    Defendants engaged in his conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

167.    Defendant Denver has a custom and practice of permitting Denver Police officers to suppress first amendment rights.

168.    Defendant Denver has a custom and practice of permitting Denver Police officers to suppress first amendment rights through failing to supervise and discipline officers when they engage in violations of first amendment rights.

169.    Denver fails to train, supervise, and discipline its officers when it comes to first amendment rights.

170.    As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

171.    Defendant's herein described acts or omissions were the moving force and the legal,

direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain, and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

172.    Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

**EIGHTH CLAIM FOR RELIEF**
**42 U.S.C. 1983 - First Amendment - Retaliation**
**(Plaintiff vs. All Defendants)**

173.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

174.    Defendant Lane acted under color of state law, and within the course and scope of his employment, in his capacity as a law enforcement officer for the DPD at all times relevant to the allegations in this Complaint.

175.    Defendant Lane is a "peace officer" under C.R.S. § 24-31-901(3) employed by a local government and therefore subject to C.R.S. § 13-21-131.

176.    Plaintiff was engaged in protected expression by filming Denver Police officers.

177.    The actions of Defendants would chill a reasonable person from engaging in activity protected by Article II, Section 10 of the Colorado Constitution.

178.    Plaintiff's expression was on a matter of public concern and did not violate any law.

179.    Plaintiff's expression occurred in a traditional public forum.

180.    Defendants responded to Plaintiff's protected activity with retaliation.

181.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of their protected rights.

182.   Defendants engaged in conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

183.   Defendant Denver has a custom and practice of permitting Denver Police officers to retaliate for first amendment speech.

184.   Defendant Denver has a custom and practice of permitting Denver Police officers to retaliate against individuals for engaging in protected first amendment activity through failing to supervise and discipline officers when they engage in excessive force.

185.   Denver fails to train, supervise, and discipline its officers when it comes to first amendment rights.

186.   As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

187.   Defendant's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

188.   Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

**EIGHTH CLAIM FOR RELIEF**
**42 U.S.C. 1983 - Failure to Train, Supervise, and Discipline**
**(Plaintiff vs. Defendant Denver)**

189.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

190.   Defendant Denver does not adequately discipline its officers when they commit

excessive force.

191.   Denver failed to adequately supervise and discipline Cody Lane after his numerous uses of excessive force.

192.   Defendant Denver knew that it was highly predictable that further instances of excessive force would occur without more and different supervision and discipline of its officers and Mr. Lane.

193.   Defendant Denver's failure to provide adequate supervision and discipline caused Plaintiff's injuries.

194.   As a direct and proximate cause and consequence of Defendant's unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

195.   Defendant's herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered during and after the protest, and other compensatory and special damages.

196.   Defendant's intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the state of Colorado.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ronald Jensen respectfully requests that this Court enter judgment in their favor and against Defendant City and County of Denver and Defendant Cody Lane, and award him all relief allowed by law, including but not limited to the following:

A.  All appropriate relief at law and equity;

B.  Declaratory relief and other appropriate equitable relief;

C.  Economic losses on all claims as allowed by law;

D.  Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

E.  Punitive damages on all claims allowed by law and in an amount to be determined at trial;

F.  Attorneys' fees and the costs, including expert witness fees, on all claims allowed by law;

G.  Pre-and post-judgment interest at the lawful rate; and

H.  Any other appropriate relief at law and equity that this Court deems just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 21st day of June 2023.

<u>/s/ Edward Milo Schwab</u>
Edward Milo Schwab, #47897
Ascend Counsel, LLC
2401 S. Downing Street
Denver, CO 80210
(303) 888-4407
milo@ascendcounsel.co

ATTORNEY FOR PLAINTIFF